[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10027

_____

D.C. Docket No. 6:12-cv-00111-ACC-GJK

PAUL ANTHONY BROWN,

Petitioner - Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
FLORIDA ATTORNEY GENERAL,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 11, 2018)

Before MARTIN, JORDAN, and ROSENBAUM, Circuit Judges.

MARTIN, Circuit Judge:

Paul Brown appeals the dismissal of his first federal habeas corpus petition

as untimely under the one-year statute of limitations set by the Antiterrorism and

Effective Death Penalty Act ("AEDPA").  See 28 U.S.C. § 2244(d)(1).  When an inmate's original habeas petition is dismissed, it is "particularly serious," because that dismissal "denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty."  Lonchar v. Thomas, 517 U.S. 314, 324, 116 S. Ct. 1293, 1299 (1996); see also Downs v. McNeil, 520 F.3d 1311, 1323 (11th Cir. 2008).

There is no doubt Mr. Brown filed his petition well after the one-year deadline set by 28 U.S.C. § 2244(d)(1).  In the District Court, Mr. Brown argued his petition was nonetheless timely because his initial deadline was subject to statutory and equitable tolling.  Without holding an evidentiary hearing, the District Court denied his arguments and denied him a certificate of appealability ("COA") as well.  This Court then granted a COA on two claims: (1) whether the District Court erred in holding Mr. Brown was not entitled to equitable tolling, and (2) whether the District Court erred in holding Mr. Brown was not entitled to statutory tolling.[1]

On even the limited record before us, Mr. Brown has pled enough facts that, if true, his petition would be timely based on equitable tolling or a combination of

---

[1] Our panel construes the COA to allow consideration of the question of whether the District Court erred in denying Mr. Brown an evidentiary hearing on his equitable and statutory tolling claims.  To the extent this expands the COA originally granted, we have authority to do so.  See Thomas v. Crosby, 371 F.3d 782, 796 (11th Cir. 2004) (Tjoflat, J. concurring) ("[O]ur cases establish the power of our court to add issues to a COA sua sponte.").  This issue was briefed and argued, since it is inextricably tied to each tolling claim.

statutory and equitable tolling.  See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060–61 (11th Cir. 2011); see also Downs, 520 F.3d at 1325.  On this long and complex case history, the District Court abused its discretion when it failed to hold an evidentiary hearing on Mr. Brown's claims.  See Lugo v. Sec'y, Fla. Dep't of Corr., 750 F.3d 1198, 1206–07 (11th Cir. 2014).  For this reason, we reverse and remand with instructions.  Our ruling renders Mr. Brown's Motion to Relinquish Jurisdiction moot, and we deny it as such.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. TRIAL AND DIRECT APPEAL

Florida charged Mr. Brown with capital murder for his role in the November 1992 stabbing death of Roger Hensley.  Brown v. State ("Brown I"), 721 So. 2d 274, 275–77 (Fla. 1998) (per curiam).  In 1994, while Mr. Brown was awaiting trial in federal custody, the Federal Bureau of Prisons determined through an assessment that Mr. Brown had a full-scale intelligence quotient ("IQ") of 78 and a verbal IQ of 73, the latter of which placed him in the fourth percentile.  Mr. Brown's trial took place in 1996.  Brown v. State ("Brown III"), 41 So. 3d 116, 117 (Fla. 2010).

As it prepared for Mr. Brown's trial, Florida struck a deal with his co-defendant, who, at the time, was known as Scott Jason McGuire.  Brown I, 721 So.

2d at 275, 282.[2]  In exchange for his promise to testify against Mr. Brown, Mr. McGuire was allowed to plead guilty to second-degree murder.  Id. at 282.  On September 28, 1993, Mr. McGuire was sentenced to a forty-year term of incarceration.  Id.

Mr. McGuire was the State's only eyewitness to the murder of Mr. Hensley. At trial, Mr. McGuire painted Mr. Brown as the more culpable actor in Hensley's killing.  See id. at 275–76.  According to Mr. McGuire, Mr. Brown hatched the plan to kill Hensley and take his truck; got the murder weapon—a steak knife— from Hensley's kitchen; and was the only one to actually inflict any wounds on Hensley.  Id. at 276.  Mr. McGuire acknowledged he was present when Mr. Hensley was killed, but implied his involvement was limited to suggesting the use a knife rather than a gun for the murder.  Id.  Further, Mr. McGuire testified he "denounced any intention of taking part in murder" after Mr. Brown handed him a steak knife.  Id.  Mr. McGuire's testimony didn't reveal his true name, his fugitive status, or his Ohio burglary conviction.  See Brown III, 41 So. 3d at 117; see also Brown II, 846 So. 2d at 1126.

---

[2] Years after his trial, Mr. Brown learned that Scott Jason McGuire was actually Scott Jeffrey Keenum, who had escaped from Ohio state prison while serving a five-to-twenty-five-year sentence for burglary and was on the run at the time of Mr. Hensley's killing.  Brown III, 41 So. 3d at 117; Brown v. State ("Brown II"), 846 So. 2d 1114, 1126 (Fla. 2003) (per curiam).  We will refer to Mr. Keenum using the name that the parties used on the record at the time.

In addition to Mr. McGuire's testimony, Florida presented inculpatory statements Mr. Brown made to the FBI, including his confession to killing "a white male" with "Scott" after McGuire hatched the plan to "find someone who owned a car, steal the car, and kill the owner." Brown I, 721 So. 2d at 276. Mr. Brown also told the FBI he "stabbed the victim several times in the chest but that McGuire slit the victim's throat." Id. (emphasis added).

Mr. Brown testified as part of his defense at trial. Id. He "denied any involvement in the homicide, claiming instead that McGuire killed Hensley while Brown was asleep as a result of smoking marijuana." Id. And he testified "that after they left the apartment, McGuire threatened to frame him for the murder if [he] told anyone about it." Id.

The jury convicted Mr. Brown of first-degree premeditated murder and first-degree felony murder. Id. At the conclusion of the penalty phase hearing, the jury unanimously recommended he be put to death. Id. at 276–77. The trial judge found four aggravating factors and two non-statutory mitigating factors, accepted the jury's recommendation, and sentenced Mr. Brown to death. Id. at 277.

The Florida Supreme Court affirmed Mr. Brown's conviction and death sentence on appeal. Id. at 277, 283. On May 3, 1999, the United States Supreme Court denied certiorari. Brown v. Florida, 526 U.S. 1102, 119 S. Ct. 1582 (1999) (mem.).

B.  POST-CONVICTION PROCEEDINGS AND RELATED FACTS

1.  Capital Collateral Regional Counsel ("Collateral Counsel")

Some time during May 1999, the Florida Supreme Court appointed Collateral Counsel to represent Mr. Brown in his post-conviction litigation.  No more than three months later, Collateral Counsel appears to have withdrawn from representing Mr. Brown.  The record does not indicate why or precisely when Collateral Counsel withdrew.[3]  The record does, however, suggest Collateral Counsel did no work on Mr. Brown's post-conviction litigation.

2.  David Damore

On August 10, 1999, the Florida Circuit Court appointed David Damore to represent Mr. Brown.  Mr. Damore was Mr. Brown's attorney of record from August 10, 1999 through February 16, 2000.  During this period, Mr. Brown was in federal custody in Beaumont, Texas.  Mr. Damore sent Mr. Brown two letters— one dated September 1, 1999 and another dated February 16, 2000.  Together, they contained four paragraphs.  The first letter asked Mr. Brown to sign and return medical releases and for "a list of all relatives  . . . and anyone [else]" who might be able to provide mitigating information about his background.  The second letter

---

[3] The closest thing to an explanation we can glean from the record is a remark made almost two years later from the Florida Circuit Court judge who let Collateral Counsel withdraw. In that judge's words, he "believe[d] that this is one of the cases where they begged off."

6

merely advised Mr. Brown that Damore would no longer be representing him and provided his new attorney's name and street address, but no phone number.

In the 190 days Mr. Damore represented Mr. Brown, nothing in this record indicates he visited Brown or spoke with him by phone. Indeed, Mr. Damore's initial letter directed Mr. Brown to correspond with him in writing. The sum total of Mr. Damore's work for Mr. Brown seems to have been sending the letters mentioned above, receiving whatever records Mr. Brown sent, communicating with his replacement at least twice, and providing his replacement with unspecified records.

### 3. John Bonaccorsy

On February 16, 2000, the Florida Circuit Court appointed John Bonaccorsy to represent Mr. Brown. Mr. Bonaccorsy had "virtually no experience in the federal appellate system." According to the record we have, the first action Mr. Bonaccorsy took on Mr. Brown's behalf was filing a motion on March 6, 2000 in the Florida Supreme Court requesting an extension for Brown's state post-conviction motion. See Fla. R. Crim. P. 3.850. In this motion, Mr. Bonaccorsy wrote he would be "starting from scratch in this case, as no work had been done on [Mr. Brown's] 3.850 or habeas corpus petition."

In the meantime, Mr. Brown tried reaching Mr. Bonaccorsy by calling both Collateral Counsel and Bonaccorsy's office. On March 30, 2000, Mr. Brown

wrote Bonaccorsy, and, on April 4, 2000, Bonaccorsy responded. In his response, Mr. Bonaccorsy included a lengthy paragraph "clarifying what appeals [Brown had] left," but never referenced, either explicitly or implicitly, federal habeas corpus. Rather, Mr. Bonaccorsy outlined the types of claims typically brought in 3.850 motions and Florida habeas corpus petitions and mentioned his agreement was to represent Mr. Brown in Florida state court and in the United States Supreme Court.

On May 3, 2000, the Florida Supreme Court granted Mr. Bonaccorsy's motion and extended the state deadline until November 3, 2000. On November 3, 2000, Mr. Bonaccorsy filed a 3.850 motion and a habeas corpus petition on Mr. Brown's behalf. Four days later, Mr. Bonaccorsy asked for leave to amend this 3.850 filing. In his motion to amend, Mr. Bonaccorsy said he had met with Mr. Brown twice since August of that year, but could not meet with him in person until then because Mr. Brown was incarcerated in Texas.[4] The Circuit Court denied that motion. Mr. Bonaccorsy was apparently able to amend Mr. Brown's 3.850 motion in early 2001: once on February 12, and once on April 26.

In his original 3.850 motion filed in November 2000, Mr. Bonaccorsy asserted Mr. Brown was entitled to a new trial based on newly discovered evidence regarding Mr. McGuire. See Brown II, 846 So. 2d at 1126. Mr. Bonaccorsy

---

[4] It appears Mr. Brown had been in the custody of Florida as of April 19, 2000.

8

uncovered this evidence after noticing Florida's Department of Corrections' website indicated the Ohio Department of Rehabilitative Corrections ("Ohio Corrections") had lodged a detainer for Mr. McGuire under the name Scott Keenum. Mr. Bonaccorsy was able to verify Ohio Corrections asked Florida Corrections to lodge the detainer around February 8, 2000. This discovery apparently led Mr. Bonaccorsy to investigate further. He ultimately learned Mr. McGuire had escaped from Mansfield Correctional Institute, an Ohio state prison, on February 15, 1989, while serving a five-to-twenty-five year sentence for burglary imposed on December 12, 1986. See id. At this time, Mr. Bonaccorsy believed Scott Keenum was merely an alias used by Scott Jason McGuire.

On January 26, 2001, Assistant State Attorney ("ASA") Sean Daly, representing Florida, wrote a letter to Ohio Corrections to request documents he needed for a February 8, 2001 evidentiary hearing. In that letter, captioned: "RE: SCOTT J. KEENUM DOC# R139358," ASA Daly asked for "a complete copy of this defendant's records from your agency." He was "most interested in the 1986 Burglary conviction case number 209931," but also requested "his entire criminal history."

Mr. Brown says Florida, through ASA Daly, did receive a copy of Mr. McGuire's record, but failed to disclose it or the letter requesting it to Mr. Bonaccorsy (or Brown), despite Bonaccorsy's attempts to get discovery on this

9

very issue.  Florida did not deny these allegations in their briefing.  Nonetheless, during oral argument of this case, Florida did deny any failure to disclose.  During argument, Florida said ASA Daly provided certified copies of the relevant Ohio convictions and indictments during the April 2001 evidentiary hearing, but only after Mr. McGuire testified.  Florida represented that ASA Daly went on record saying he had not realized he had these documents until after Mr. McGuire testified and he was providing copies to Mr. Bonaccorsy.  The record before us does not include copies of the criminal history documents or transcripts of the parts of the April 2001 hearing referenced by Florida during its oral argument of this case.

At the April 2001 evidentiary hearing, Mr. McGuire was called to testify as Mr. Brown's witness.  Before Mr. McGuire took the stand, ASA Daly insisted the Circuit Judge appoint Fifth Amendment counsel for him to advise him "if he were to get on the stand and say something different than he testified to at trial under oath, he could very well find himself facing the death penalty."  The Circuit Judge did as ASA Daly requested and asked Fifth Amendment counsel to advise Mr. McGuire whether Florida could "seek to set aside his original plea"—which was conditioned on his truthful testimony—if he recanted.  After consulting with Mr. McGuire, Fifth Amendment counsel advised the court McGuire would be pleading the Fifth.  Nonetheless, Mr. Bonaccorsy called Mr. McGuire to the stand.

10

Mr. McGuire was sworn in as Scott Jason McGuire.  ASA Daly then announced "the State of Florida wants it understood that we have not subpoenaed Mr. McGuire.  We are not immunizing him in any way, and that anything he says can be used against him."  Mr. McGuire then pled the Fifth when Mr. Bonaccorsy asked if his name was Scott Jason McGuire; if he had been convicted of "aggravated battery" in Ohio in 1986; if he had escaped from a state prison in Ohio on February 15, 1989; if he was "an escaped convict from the State of Ohio" when Mr. Hensley was murdered; and if he had ever gone by the name "Scott Kenan." Not once during this hearing did ASA Daly refer to Mr. McGuire as Scott Jeffrey Keenum.  Indeed, each time ASA Daly mentioned him by name, he called him "McGuire."

On April 30, 2001, the Circuit Court denied Mr. Brown's 3.850 motion and habeas petition.  While his appeal was pending in the Florida Supreme Court, Mr. Brown wrote Mr. Bonaccorsy in a letter dated March 26, 2002, inquiring about the status of his appeal.  Mr. Bonaccorsy wrote back on April 1, 2002, noting that, "[i]f we do not get a favorable opinion the Florida Supreme Court, the next place to appeal would be to the federal courts."

The Florida Supreme Court affirmed the denial of Mr. Brown's 3.850 motion and habeas petition on April 24, 2003.  Brown II, 846 So. 2d at 1128.  The court rejected Mr. Brown's claim that he was entitled to a new trial based on "Scott

11

McGuire's use of an alias, as well as a conviction McGuire received for aggravated burglary in Ohio and his subsequent escape from a correctional institution there," which Mr. Brown's counsel discovered "[f]ollowing trial." Id. at 1126. The court understood Mr. Brown to allege this evidence "would have shown that McGuire, not Brown, killed Roger Hensley to avoid detection" and would have rendered Mr. McGuire's testimony incredible. Id. Like Mr. Bonaccorsy, the court thought Scott Jason McGuire was the real person using Mr. Keenum as an alias. See id. Ultimately, the court concluded "[t]he probability that this evidence would have resulted in Brown's acquittal at trial is extremely remote, at best, in light of the other evidence presented to the jury." Id. The mandate issued on May 27, 2003.

On July 1, 2003, Mr. Bonaccorsy filed a motion to withdraw as counsel. In the motion, he explained he "ha[d] virtually no experience in the federal appellate system."[5] He had arranged for Mary Catherine Bonner to take over Mr. Brown's representation on the recommendation of Roger Maas, the Executive Director of the Florida Commission on Capital Cases. Ms. Bonner, he wrote, would "accept representation to pursue MR. BROWN'S Petition for Writ of Certiorari in the United States Supreme Court and in his federal Habeas Corpus." This motion was served on Mr. Brown, and it was granted by the Florida Circuit Court on July 18, 2003.

---

[5] Mr. Bonaccorsy made the same statement in his June 26, 2003 motion for an extension of time to file a certiorari petition to the Supreme Court.

Mr. Bonaccorsy's motion drew a letter of objection from Mr. Brown, dated July 28, 2003 and addressed to Ms. Bonner. Mr. Brown wrote that "Mr. Bonnaccorsy [sic] at the last minute told me he wasn't qualified to represent me on a federal level" and requested new counsel "because I wasn't thoroughly consulted on the matter." Mr. Brown asked Ms. Bonner to provide the necessary paperwork "to have [her] taken off [his] case."

4. Mary Catherine Bonner

Ms. Bonner requested a status-of-counsel hearing in the Florida Circuit Court, which took place on September 22, 2003. At the hearing, Ms. Bonner said she had asked for the hearing "to make [Mr. Brown] comfortable in the most important litigation of his life [which has] been moved into federal court," noting Mr. Brown's "largest problem" was that Mr. Bonaccorsy had not "completely consulted" him. Ms. Bonner suggested that she was experienced—if not an expert—in federal habeas corpus litigation, that other counsel on the registry to take death penalty cases were not comfortable with the relevant procedural issues, including "time bar" issues, and that she had been recommended because she was. After speaking with Mr. Brown privately, Ms. Bonner remained counsel of record.

Mr. Brown wrote Ms. Bonner a letter dated December 3, 2003. In this letter, Mr. Brown asked her to provide him with relevant case documents, as he did not "have much of anything"; to "appeal [his] case straight on to the U.S. Supreme

13

Court"; and to set up a phone call to discuss "this issue" "in detail." There is no indication in the record that Ms. Bonner complied with any of Mr. Brown's requests.

Instead, on February 17, 2004, Ms. Bonner moved for discovery in state court, even though no state post-conviction motion was pending. The request appears to have been for various documents relating to Scott Jeffrey Keenum, including fingerprint cards, Ohio criminal and corrections records, and FBI, National Crime Information Center, and Florida Crime Information Center records.[6] Florida moved to strike, arguing that Mr. Brown was not entitled to the records because there was no claim pending, that all public records on the matter had been previously disclosed, and that the motion didn't assert Florida possessed the requested documents.

While this motion was pending, Ms. Bonner communicated with her investigator regarding Mr. Brown's federal and state post-conviction litigation. A May 1, 2004 e-mail from the investigator to Ms. Bonner communicated his "agree[ment]" Mr. Brown's "365 [day federal habeas deadline] probably ran before the 3.850 was filed." In light of this understanding, Ms. Bonner and her investigator were apparently working together to convince Mr. Brown it would "be

---

[6] Aside from the successive state post-conviction motion Ms. Bonner filed on April 4, 2007 and the Florida Circuit Court's summary order denying that motion, no documents related to Mr. Brown's successive state post-conviction litigation are part of the record on appeal.

14

better to go back to the [state] trial court for relief." Ms. Bonner's investigator

wrote Mr. Brown previously "seemed to grasp[]" the idea of going back to state

court, but "[n]ow, all [Brown] knows is that someone told him about his 'Federal

issues' and that is all he knows." The investigator suggested Ms. Bonner read one

of the two Florida Supreme Court opinions on Mr. Brown's case so she could see

Mr. Brown testified at trial. That information would, in the investigator's view,

help persuade Mr. Brown "his 'issues' are weak," if she could "not convince [Mr.

Brown] of the time issue."

On May 11, 2004, the Florida Circuit Court granted Ms. Bonner's discovery

request. The State then asked the Florida Supreme Court to stay and quash the

Circuit Court's order on June 28, 2004.[7] The justices granted Florida's request on

November 5, 2004. Ultimately, on May 19, 2005, the Florida Supreme Court

denied Florida's appeal as untimely and denied Florida's motion for rehearing on

August 26, 2005.

In the meantime, Mr. Brown wrote Ms. Bonner on September 29, 2004

demanding she withdraw from representing him. He began, "This is a notice to let

you know you are to withdrawal [sic] from my case! You have lied to me and

distorted the appeal process from the beginning," noting Ms. Bonner had

---

[7] At oral argument of this case, Florida told us this request was motivated by the fact that the records requested, including Florida Crime Information Center and National Crime Information Center records, are privileged under federal law.

15

"distance[d] [herself] as much as possible from [him]." He again demanded she withdraw so he could "state [his] facts in court!" On February 16, 2005, Mr. Brown wrote Mr. Maas noting he had written five letters to Ms. Bonner, requesting a new attorney because she was "unable to repercent [sic] me fully," and asking for copies of the May 11, 2004 decision granting his discovery request.

On February 24, 2005, Ms. Bonner wrote to Mr. Brown that she had received his letter from Mr. Maas and "apologized for the lack of letters," noting "when nothing new is going on, there is little to say." Ms. Bonner continued:

> My thoughts are as follows: since we have a good faith belief that the State lied to the court or to the jury or to both, we might file a [successive] motion based upon newly discovered evidence . . . . I know that your preference has always been to go to and litigate in the federal court. But when we have an issue which resonates so loudly with our trial judge, who is no softie, I see no reason to give it up.
>
> As I told you before, if we can establish that they knew at the time of trial who this guy really was and that he was a liar, that is a fraud on the court, the prosecutors can be disbarred and you <u>might</u> not even have to stand trial again because of their manipulations.
>
> With the upside so wonderful for you, and the downside being a time factor only, I have been proceeding as I believed you wanted— making a grand effort to establish beyond any doubt you were the victim here. If we can do that, you may well be free entirely.
>
> . . . .
>
> . . . If you want to go forward with the new evidence before the Supreme Court rules, just let me know.

On the record before us, Ms. Bonner never sent Mr. Brown another letter.

16

On December 18, 2006, Florida submitted evidence responsive to Ms.

Bonner's motion for discovery about Scott Jeffrey Keenum to the Florida Circuit

Court for in camera review.  Florida also gave some non-confidential documents to

Ms. Bonner.  Then, on February 21, 2007, the Circuit Court provided the

documents reviewed in camera (the "Keenum documents") to Ms. Bonner.  None

of these documents is part of the record on appeal.  However, according to Mr.

Brown, some of these documents suggest Florida law enforcement agencies knew

about, or at least had information probative of, the connection between Mr.

McGuire and Mr. Keenum before Mr. Hensley's murder and, thus, before Brown's

trial.

Nearly one year later, on February 7, 2008, Ms. Bonner filed a successive

state post-conviction motion pursuant to Florida Rule of Criminal Procedure 3.851,

which Mr. Brown signed on April 4, 2007.  The motion alleged "at the time of trial

in 1996, the State knew or should have known that Brown's codefendant, who was

a State witness, testified under the false name of Scott Jason McGuire, thereby

concealing the fact that he was Scott Jeffrey Keenum, an escapee from an Ohio

felony conviction and sentence."  Brown III, 41 So. 3d at 117.  The pleading also

"alleged that the State knowingly presented false testimony by calling the

codefendant to the stand and allowing him to testify as McGuire."  Id.  It argued

this "resulted in nondisclosure of important impeachment [evidence] that would

17

probably have resulted in a lesser verdict or sentence." Id.  On May 7, 2008, the Circuit Court summarily denied the motion as procedurally barred, concluding the issue had previously been litigated and affirmed in Brown II, 846 So. 2d 1114, and the facts did "not constitute newly-discovered evidence," were "not material," and "would not change the outcome of either the trial or the penalty phase."

On January 9, 2009, Ms. Bonner asked the Florida Supreme Court to stay proceedings due to her poor health.  The court granted Ms. Bonner's motion and remanded to the Circuit Court to determine whether Ms. Bonner could continue to represent Mr. Brown in a timely manner.  The Circuit Court determined she couldn't "due to medical reasons."  The Florida Supreme Court then discharged her on April 16, 2009 and remanded the case for the Circuit Court to appoint new counsel within ten days.

5. Christopher Anderson

On April 20, 2009, the Circuit Court appointed Christopher Anderson to represent Mr. Brown.  The record suggests Mr. Anderson did not communicate by letter with Mr. Brown until November 3, 2010, when Anderson replied to Brown's letter of October 6, 2010.  There is no indication in the record they met in person before January 27, 2011.

While Mr. Anderson was counsel of record, the Florida Supreme Court affirmed the dismissal of Mr. Brown's 3.851 motion as procedurally barred on

18

June 17, 2010. Brown III, 41 So. 3d at 117–18. The court ruled "the evidence which Brown claims as newly discovered was known, or with due diligence could have been known, by Brown's counsel at the time of the initial postconviction proceeding [in 2001]." Id. at 117; see Fla. R. Crim. P. 3.851(d)(1), (d)(2)(A). The court rejected the claim that the "newly discovered evidence . . . was the conduct of the prosecutor at the [2001] evidentiary hearing . . . indicating that the State may have known of McGuire's true identity as Keenum" at the time of trial, concluding a claim based on this could have been filed within a year of the evidentiary hearing. See Brown III, 41 So. 3d at 117–18.[8]

Chief Justice Quince dissented, and Justice Pariente joined her dissent. Id. at 118 (Quince, C.J., dissenting). The majority, they observed, treated Mr. Brown's claim as one about newly-discovered evidence. Id. In a case "ripe for a warrant," the majority had not, however, assessed "the role of the prosecutor in either withholding exculpatory or impeaching evidence or the prosecutor's knowing use of false evidence," which could have been "easily resolved by an evidentiary hearing." See id. This was "a potentially serious issue," as Mr. McGuire's "credibility was of paramount importance." Id. The Florida Supreme Court denied rehearing on July 28, 2010. Id. at 116.

---

[8] The Florida Supreme Court also noted Mr. Brown's counsel—presumably Mr. Anderson—conceded he had no evidence that Florida knew of Mr. McGuire's true identity at trial. Id. at 118.

On October 6, 2010, Mr. Brown wrote to Mr. Anderson, asking what Justices Quince and Pariente meant by "ripe for a warrant," a statement that "ha[d] [him] and some others baffled."  Mr. Anderson replied nearly a month later on November 3, 2010.  He explained "ripe for a warrant" meant "your case has been around for quite a while and moving closer along the time line toward the issuance of a death warrant."  The remainder of the letter responded to concerns other than those Mr. Brown raised in his October 6th letter, suggesting Brown had sent at least one other letter that is not part of the record.  In particular, Mr. Anderson wrote "the 'issue' in your case is not Kate Bonner's health," but rather the potential "'Giglio violation'" regarding Mr. McGuire's fake name and prison-escapee status."  Mr. Anderson reassured Mr. Brown he was still "fighting for [him]," noting he had just filed a certiorari petition with the U.S. Supreme Court.

Mr. Brown confirmed he received "late" notice of the certiorari petition in a January 25, 2011 letter.  In this letter, Mr. Brown wrote:

> I hope you are not going to 'bypass' the federal district in Jacksonvill [sic]! And the 11 circuit [sic] in Atlanta.  If you have, I need to know now!  Because I have to get a new lawyer on my case immediately. However I do hope you would not make a mistake of that magnitude when a mans [sic] life is at stake?

And on February 5, 2011, "Ms. Price of England" called Mr. Anderson's office on Mr. Brown's behalf, indicating Mr. Brown was "concerned" about "filing date w/

20

Fed Appeal Courts." The memo documenting this call instructs Mr. Anderson to "write [Mr. Brown] a letter."

The U.S. Supreme Court denied certiorari on February 22, 2011. Brown v. Florida, 562 U.S. 1225, 131 S. Ct. 1476 (2011) (mem.). Then, on March 3, 2011, Mr. Brown wrote to Mr. Anderson, asking if he "receive[d] the letter [he] wrote [] last week in regards to [his] appeal in the federal district court in Jacksonvill [sic] and the 11th Circuit in Atl [Atlanta]" and noting he is "concern [sic] about this issue as others."

Mr. Brown again wrote Mr. Anderson on November 7, 2011, asking where his "case stands on appeal." He "need[ed] this information greatly to proceed with [his] appeal in federal courts." But "[a]fter the Florida Supreme Court turn [sic] [his] appeal down," Mr. Brown "ha[d] not heard anything at all back from [Mr. Anderson]. Even after [he] had several people contact [Anderson's] office."

On January 18, 2012, Mr. Anderson moved in the U.S. District Court for the Middle District of Florida–Jacksonville Division to be appointed to represent Mr. Brown in Mr. Brown's federal habeas litigation. In that motion, Mr. Anderson stated Mr. Brown "has expressed a desire to have the undersigned attorney continue to represent him in federal court." And on February 8, 2012, Mr. Anderson filed a federal habeas petition, pursuant to 28 U.S.C. § 2254, on behalf of Mr. Brown. Mr. Anderson made only one claim for relief: the same claim Ms.

Bonner asserted in Mr. Brown's 3.851 motion.  The petition said it was "timely," affirmatively stating it was "not barred by the 1-year statute of limitations contained in 28 USC Section 2244(d)" and averring "[t]he time-limit provisions of the AEDPA ha[d] been explained to and understood by Petitioner."

On March 28, 2012, Florida's Office of Executive Clemency wrote a letter to the Florida Circuit Court requesting clemency counsel be appointed for Mr. Brown.  On April 6, Mr. Brown wrote Mr. Anderson asking "why [he was] being serve [sic] with the clemency proceedings when [he] still ha[d] appeals."  He also asked why Mr. Anderson had not yet responded to his "last letter in March" or provided any information "as to the situation involving [his] appeal in the District Court in Orlando."  On the record before us, this is the last communication between Mr. Brown and Mr. Anderson.

On January 28, 2014, the District Court granted Florida's motion to dismiss Mr. Brown's § 2254 petition as untimely, ruling Mr. Brown was not entitled to equitable tolling or tolling under the actual innocence exception.  And on February 24, 2014, Mr. Anderson filed a notice of appeal to this Court.  In a brief to this Court, Mr. Anderson conceded that his conduct might support an argument for equitable tolling; that this created an unwaivable conflict of interest; that he should therefore be discharged as Mr. Brown's attorney; and that replacement counsel

should be appointed.  This Court granted Mr. Anderson's request in the interests of justice and appointed Linda McDermott, current counsel of record.

6.    Remand and Decision Below

Upon the appointment of Ms. McDermott, this panel granted Mr. Brown's request to remand his case to the District Court to allow him to "develop the factual record with respect to his equitable tolling claim."  In so doing, we noted that Mr. Brown had not had the benefit of his statutory right to conflict-free counsel while Mr. Anderson was representing him in District Court.  See Christeson v. Roper, 574 U.S. __, 135 S. Ct. 891, 894 (2015).

In response the remand order, the District Court allowed Mr. Brown to file a supplemental § 2254 petition.  In his supplemental petition, Mr. Brown claimed he was entitled to equitable and statutory tolling.  Despite Mr. Brown's request for an evidentiary hearing, the District Court declined to hold one, ruled he was not entitled to equitable or statutory tolling, and denied a COA.

## II.    STANDARD OF REVIEW

We conduct de novo review of a § 2254 petition has been dismissed as time-barred.  See Downs, 520 F.3d at 1318; Johnson v. Fla. Dep't of Corr., 513 F.3d 1328, 1330 (11th Cir. 2008).  Functionally, this means we review de novo the District Court's application of equitable and statutory tolling to the facts found by the District Court.  See Johnson, 513 F.3d at 1330, 1331–33.  Those facts are

23

subject to clear error review, so "we must affirm [them] unless the record lacks substantial evidence to support them." Lugo, 750 F.3d at 1206.

We review the District Court's denial of an evidentiary hearing for abuse of discretion. Id. at 1206–07. In the tolling context, a District Court abuses its discretion by denying an evidentiary hearing when the petitioner's proffered facts, if true, would make the petition timely under AEDPA's one-year limitation period. See id. at 1207; see also Downs, 520 F.3d at 1313 (remanding for an evidentiary hearing on attorney misconduct).

### III.    ANALYSIS

When the U.S. Supreme Court declined to review Mr. Brown's direct appeal on May 3, 1999, his conviction became final under 28 U.S.C. § 2244(d)(1)(A). See Gonzalez v. Thayer, 565 U.S. 134, 150, 132 S. Ct. 641, 653 (2012). That meant he had until May 3, 2000 to timely file a § 2254 petition. See 28 U.S.C. § 2244(d)(1)(A); see also Ferreira v. Sec'y, Dep't of Corr., 494 F.3d 1286, 1289 n.1 (11th Cir. 2007). But no federal petition was filed until February 8, 2012.

Therefore, Mr. Brown's petition can be deemed timely only if some combination of tolling, whether statutory or equitable, can account for the delay. Even the limited record before us reveals Mr. Brown pled enough alleged facts to account for the delay. Yet as it stands, that record is not sufficiently developed for us to decide whether Mr. Brown is entitled to tolling. For this reason, we will

remand for an evidentiary hearing on Mr. Brown's statutory and equitable tolling claims as detailed below.

## A. STATUTORY TOLLING

### 1. Legal Framework

AEDPA's 1-year limitations period may be tolled under the terms of the statute. See 28 U.S.C. § 2244(d). Mr. Brown claims he is eligible for statutory tolling under 28 U.S.C. § 2244(d)(1)(B) and (D). Those provisions say AEDPA's limitation period runs "from the latest of" either "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action" or "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Id. § 2244(d)(1)(B), (D). "The time during which a properly filed application for State post-conviction . . . review . . . is pending shall not be counted toward any period of limitation" computed through application of these provisions. Id. § 2244(d)(2).

"To delay the running of the statute of limitations, § 2244(d)(1)(B) requires state action that both violated the Constitution or laws of the United States and prevented the prisoner from filing his federal petition." Johnson, 513 F.3d at 1331–32 (quotation marks omitted and alterations adopted). "[T]he limitation

25

period does not begin until after the state impediment is removed." Wyzykowski v. Dep't of Corr., 226 F.3d 1213, 1216 (11th Cir. 2000). And § 2244(d)(1)(D) will toll the limitations period when, for instance, post-conviction motions "produce newly discovered exculpatory evidence." Larry Brown v. Sec'y, Dep't of Corr., 530 F.3d 1335, 1338 (11th Cir. 2008). "AEDPA grants the movant a year from that discovery . . . to challenge their conviction in federal habeas proceedings." Id.

## 2. Analysis

We begin by outlining Mr. Brown's statutory tolling arguments. Mr. Brown says he is entitled to statutory tolling because the State impeded his ability to file his petition and he learned new facts. His view is based on Florida's belated disclosure of the fact that its only eyewitness had lied under oath about his identity and his criminal past. Of course, the sole eyewitness was, as Mr. Brown ultimately learned, not Scott Jason McGuire, but Scott Jeffrey Keenum. Mr. Keenum had escaped from Ohio state prison while serving a sentence for aggravated burglary and was on the run at the time of Mr. Hensley's murder. In Mr. Brown's view, Florida "knowingly presented false testimony by calling [Keenum] to the stand and allowing him to testify as McGuire." Brown III, 41 So. 3d at 117. Until it disclosed the documents about Mr. Keenum on February 21, 2007 in response to a court order, Florida fought Mr. Brown's repeated efforts to get the documents it had in its possession both before and after trial. These documents would have told

26

or led to the truth about Mr. Keenum.  Mr. Brown points to efforts to get these records as early as 2000.  In fighting Mr. Brown's efforts, Florida "impeded [him] from filing his motion for postconviction relief."

Finding Mr. Brown "was aware of this information in 2001," the District Court ruled Mr. Brown could not avail himself of tolling on this basis, because he "waited almost eleven years . . . to file the Petition."  Underlying this finding is the District Court's assumption that Mr. Brown learned nothing new and gained nothing through Florida's disclosure of the Keenum documents on February 21, 2007.

The record before us casts doubt on the District Court's assumption.  Indeed, it suggests that until Florida disclosed the Keenum documents, Mr. Brown did not know a key factual predicate to the claim he ultimately made in federal habeas: that Florida law enforcement agencies possessed information that might have revealed the truth about Mr. Keenum before and during Mr. Brown's trial.  If true, these facts would entitle Mr. Brown to statutory tolling until Brown III was no longer pending: July 28, 2010.  See 28 U.S.C. § 2244(d)(2).  And, as explained in the following section, Mr. Brown has pled sufficient facts to demonstrate he is entitled to equitable tolling between July 28, 2010 and February 8, 2012, when Mr. Anderson finally filed a § 2254 on his behalf.  Therefore, on this record, the

27

District Court should have conducted an evidentiary hearing on Mr. Brown's statutory tolling claims.

Until the Keenum records were disclosed, Mr. Brown apparently didn't know if Florida possessed information regarding Mr. Keenum's true identity before or during Mr. Brown's trial. The Keenum records suggested Florida did. As Mr. Brown asserts, Florida law enforcement agencies had information about the "connection between McGuire and Keenum," including additional aliases and evidence that, during a previous arrest in Florida, Mr. Keenum possessed the will of his father, whose last name was Keenum. This was not an insignificant discovery: Florida's possession of the Keenum records or other similar records before trial is a critical element of a Brady claim. See Dist. Att'y's Off. v. Osborne, 557 U.S. 52, 68–69, 129 S. Ct. 2319–20 (2009) (suggesting Brady's disclosure requirement does not extend to material exculpatory evidence obtained by the government after trial); see also In re Magwood, 113 F.3d 1544, 1548–49 (11th Cir. 1997) (per curiam) (reiterating that government suppression, and thus possession, of evidence favorable to the accused is a necessary component of a Brady claim). Thus, on the record before us, Florida's disclosure of the Keenum records on February 21, 2007 eliminated an impediment to the factual basis of Mr. Brown's Brady claim. See 28 U.S.C. § 2244(d)(1)(B); see also Wyzykowski, 226 F.3d at 1216.

February 21, 2007 may also have been "the date on which the factual predicate of the claim . . . could have been discovered through the exercise of due diligence." See 28 U.S.C. § 2244(d)(1)(D). Because the District Court's finding that Mr. Brown "was aware of [the Keenum] information in 2001" rested on a misapprehension of the record, its ruling that Mr. Brown didn't "demonstrate due diligence" as to this claim necessarily did as well. Of course, Mr. Brown's attorneys might have obtained the complete Keenum documents earlier, had they filed a 3.851 motion sooner. But Florida's strident opposition to Mr. Brown obtaining the truth about Mr. Keenum suggests otherwise.

Thus, the record before us strongly suggests the one-year limitations period began to run on February 21, 2007. See 28 U.S.C. §§ 2244(d)(1)(B), (D). On February 8, 2008, Ms. Bonner filed a 3.851 motion, which, in our view, was properly filed. See Green v. Sec'y, Dep't of Corr., 877 F.3d 1244, 1247–48 (11th Cir. 2017) ("The question of whether an application is properly filed is a different one from that of whether the claims in the application have merit and are free from procedural bar."). That motion remained pending until the Florida Supreme Court denied rehearing on July 28, 2010. If, as we have concluded based on this record, the limitations period began to run on February 21, 2007, Mr. Brown and Mr. Anderson had fourteen additional days—until August 11, 2010—to timely file his § 2254 petition. Of course, that did not happen. But, for the reasons that follow,

29

Mr. Brown may be entitled to equitable tolling from August 11, 2010 until Mr. Anderson filed Mr. Brown's § 2254 petition.  Therefore, Mr. Brown is entitled to an evidentiary hearing on his statutory tolling claims under § 2244(d)(1)(B) and (D).  See Downs, 520 F.3d at 1318, 1323–24.

At that hearing, the following documents should be made part of the record: complete transcripts of the April 2001 evidentiary hearing; copies of the documents ASA Daly gave to Mr. Bonaccorsy at that hearing; and copies of the documents provided to Ms. Bonner on December 18, 2006 by Florida and on February 21, 2007 by the Florida Circuit Court.  We do not mean to suggest the District Court's hearing should be limited to taking or considering this evidence. However, we think these documents will be essential to determining the relevant facts.

B.  EQUITABLE TOLLING

1.  Legal Framework

A habeas petitioner is entitled to "equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  Holland v. Florida, 560 U.S. 631, 649, 130 S. Ct. 2549, 2562 (2010) (quotation marks omitted).  These "are separate elements, both of which must be met before there can be any equitable tolling."  Cadet v. Fla. Dep't of Corr. ("Cadet II"), 853 F.3d 1216, 1225

30

(11th Cir. 2017).  Deciding these elements requires careful, individualized consideration and a case-by-case inquiry.  See id. at 1228; see also Downs, 520 F.3d at 1322.   And it requires attention to the principle that equitable tolling is appropriate only "in extreme cases where failure to invoke the principles of equity would lead to unacceptably unjust outcomes."  Downs, 520 F.3d at 1318.

Due diligence, a question of fact, is not "maximum feasible diligence." Holland, 560 U.S. at 653, 130 S. Ct. at 2565 (quotation marks omitted); Martin v. McNeil, 633 F.3d 1257, 1265, 1271 (11th Cir, 2011).  Instead, it is "reasonable diligence," which requires reasonable efforts.  Id. (quotation marks omitted). Reasonable diligence "does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option."  Downs, 520 F.3d at 1323 (quotation marks omitted).  Determining whether a petitioner has been diligent requires individualized consideration.  Id.  The inquiry "must take into account the conditions of confinement and the reality of the prison system."  Id. (quotation marks omitted).  And it should account for a petitioner's alleged mental incapacity, where there is reason to believe it might have "affected a petitioner's ability to file a timely habeas petition."  See Hunter v. Ferrell, 587 F.3d 1304, 1308 (11th Cir. 2009).

There is no exhaustive list of what qualifies as an extraordinary circumstance.  See Cadet II, 853 F.3d at 1218.  Serious attorney misconduct does

31

qualify. See Holland, 560 U.S. at 652, 130 S. Ct. at 2564. Ordinary negligence, illustrated by "a simple miscalculation that leads a lawyer to miss a filing deadline," does not amount to serious attorney misconduct. See id. at 651–52, 130 S. C.t at 2564 (quotation marks omitted). Neither does good faith gross negligence—such as miscalculating a filing deadline and "repeatedly assur[ing] [the petitioner] that [AEDPA's limitations period] did not begin to run until after the denial of his state post-conviction motion," based solely on a misreading of the relevant statute without additional legal research. See Cadet II, 853 F.3d at 1234, 1237. This is in contrast to bad faith, dishonesty, divided loyalty, and an attorney's mental impairment, which can constitute serious attorney misconduct. Id. at 1236. Abandonment—illustrated by not keeping a client updated on essential developments, not responding to a client's questions or concerns, and severing communication with a client—can as well. See id. at 1234 (citing Holland, 560 U.S. at 652, 130 S. Ct. at 2564). And "other instances of [qualifying] attorney misconduct [] can be identified as they arise in future cases." Id. at 1237.

"In considering whether the conduct of counsel was extraordinary, we will not dissect the continuing course of conduct in which counsel engaged, but rather view counsel's behavior as a whole." Downs, 520 F.3d at 1323. In keeping with that approach, attorney misconduct can qualify as extraordinary, even if it was only negligent or grossly negligent at times, as long as the misconduct is sufficiently

32

serious on the whole.  See Holland, 560 U.S. at 652, 130 S. Ct. at 2564; see also Downs, 520 F.3d at 1323.  Said another way, acts of ordinary or gross negligence will not strip otherwise serious attorney misconduct of its extraordinary character. See Holland, 560 U.S. at 652, 130 S. Ct. at 2564; see also Downs, 520 F.3d at 1323; cf. Cadet II, 853 F.3d at 1225–26 (noting the question before the court was "whether attorney error that amounts to gross negligence standing alone is a sufficiently extraordinary circumstance for equitable tolling purposes, or whether the attorney's negligent error must amount to or be accompanied by some other factor such as, to name one example, abandonment of the attorney-client relationship" (emphasis added)).  Thus, a petitioner may still establish serious attorney misconduct even if his attorneys at times acted appropriately, negligently, or grossly negligently.  See Holland, 560 U.S. at 652, 130 S. Ct. at 2564; see also Downs, 520 F.3d at 1323.

2. Analysis

a. *Attorney Misconduct*

For over a decade after his conviction and sentence became final, Mr. Brown waited on death row, hoping and expecting he would at least have the chance to be heard in federal court.  The first four attorneys appointed to represent him failed to meet this expectation.  The fifth attorney waited nearly three years from the day he was appointed to file a § 2254 petition on Mr. Brown's behalf.

33

Nevertheless, the District Court summarily dismissed credible and well-supported allegations of twelve years of serious attorney misconduct.  The court framed its analysis of the alleged attorney misconduct by citing the holding from Cadet v. Fla. Dep't of Corr., 742 F.3d 473 (11th Cir. 2014) ("Cadet I"), which has since been vacated on panel rehearing in Cadet II, 853 F.3d 1215.  Compare Cadet I, 742 F.3d at 481, with Cadet II, 853 F.3d at 1236.  The District Court never addressed Mr. Brown's argument he was entitled to equitable tolling because his first two attorneys—Collateral Counsel and Mr. Damore—did no work on his case.  And, as for Mr. Bonaccorsy, Ms. Bonner, and Mr. Anderson, the District Court found their behavior to be negligent at worst.  The court suggested what Ms. Bonner and Mr. Anderson did—or, more correctly, didn't do—was irrelevant, because the AEDPA deadline had already been blown by the time they were appointed.

Mr. Brown's pleadings allege a long course of attorney misconduct, well beyond gross negligence, which amounted to abandonment, bad faith, divided loyalty, and even dishonesty.  On this record, the District Court abused its discretion by denying Mr. Brown's request for an evidentiary hearing on attorney misconduct.  Beyond that, the District Court abused its discretion in applying an incorrect legal standard, which may have impacted its analysis of the alleged attorney misconduct.  We address each of these issues in turn.

Before beginning its analysis of attorney misconduct, the District Court quoted Cadet I, 742 F.3d at 481, as follows: "[A]ttorney negligence, however gross or egregious, does not qualify as an 'extraordinary circumstance' for purposes of equitable tolling; abandonment of the attorney-client relationship, such as may have occurred in Holland, is required." The District Court could not have known when it ruled on Mr. Brown's case that the Cadet panel would vacate the opinion containing the language the District Court relied upon and issue a new opinion removing it. See Cadet II, 853 F.3d at 1236. The revised panel opinion remarked on its "wish to [not] be misunderstood" as having held that "abandonment is the only circumstance that can meet the extraordinary circumstance element for equitable tolling." Id. Relevant here, the now operative Cadet II opinion recognized "some courts ha[d] misinterpreted our previous opinion in this case to mean that." Id. So ultimately, the Cadet II opinion clarified its only holding: something more than grossly negligent attorney misconduct was required to establish an extraordinary circumstance. See id.

During the pendency of Cadet I, the District Court here was one of the courts that "misinterpreted" it, and, as a result, applied the wrong standard in Mr. Brown's case. Indeed, it quoted the exact language removed in Cadet II. We view Cadet I as playing a significant part in the District Court's analysis, as it framed its discussion of the attorney misconduct using the very language that was later

35

removed.  The District Court thus applied an incorrect legal standard, and in doing so, abused its discretion.  See Lugo, 750 F.3d at 1206–07.

The correct legal standard and a close review of the record would have led the District Court to quite a different conclusion about the seriousness of the attorney misconduct endured by Mr. Brown.  That misconduct began with the post-conviction process.  Given AEDPA's tight deadline, the early days and months after a conviction becomes final are some of the most critical.  See Downs, 520 F.3d at 1322, 1324 (highlighting the seriousness of attorney misconduct that functionally deprives an inmate of "several months" of the AEDPA limitations period).  Even so, this record reveals that no work whatsoever was done in any of Mr. Brown's post-conviction litigation by Collateral Counsel or Mr. Damore. Assuming Collateral Counsel was appointed when Mr. Brown's conviction became final, its lawyers together represented Mr. Brown for 289 days, leaving only 76 days to investigate, prepare, and file a § 2254 petition.  Yet, we have found no indication any attorney from Collateral Counsel was assigned to represent Mr. Brown.  Certainly, this record reveals no attempt by anyone from Collateral Counsel to contact or visit Mr. Brown, even though they first had $5,000 and then an additional $10,000 at their disposal to cover such expenses.  See Fla. Stat. § 27.711(6) (1998) (setting $5,000 limit to cover such expenses); see also Fla. Stat. § 27.711(6) (1999) (increasing limit to $15,000).

36

Mr. Brown's plight only moderately improved with Mr. Damore.  Mr. Damore sent Mr. Brown one two-paragraph-long letter more than three weeks after his appointment and a second letter 169 days later, which was the same day he withdrew from the case.  Beginning by stating Mr. Damore had "just received the appointment," the first letter suggested Damore would not visit Mr. Brown and directed Brown to stay in contact in writing.  Beyond that, the first letter suggested Mr. Damore had not begun reviewing Mr. Brown's case materials[9] and provided little, if any, guidance on Mr. Brown's rights.  The letter implied Mr. Damore would be "preparing [his] initial post-conviction pleading."  It also requested Mr. Brown sign enclosed medical releases and provide a list of relatives who might be able to speak on Brown's "background, family life, history of abuse or mental illness, and/or drug addiction," which likely gave Brown some comfort that Mr. Damore was undertaking his representation with some resolve.

Any comfort Mr. Brown derived was short-lived.  After that letter, Mr. Brown did not hear from Mr. Damore for nearly six months.  Then, Mr. Damore wrote Mr. Brown to say he was no longer his attorney and to provide Mr. Bonaccorsy's name and address—not his phone number.  On the record before us, these two letters represent the sum total of the work done by Mr. Damore during the 190 days he represented Mr. Brown.

---

[9] Mr. Damore wrote he had "begun to compile information about [Mr. Brown's] case and will review [his] trial transcripts, appeals, and any other relevant materials."

Thus, within the first 289 days of Mr. Brown's 365-day limitations period, the only work on his case was one letter asking Brown for mitigation evidence. Thus, Mr. Bonaccorsy was right when he said "no work ha[d] been done on [the] case." We would be hard pressed to call this anything other than abandonment. See Holland, 560 U.S. at 651, 130 S. Ct. at 2564 (failing to prepare and file a § 2254 petition, despite having substantial time to do so, and failing to communicate with a petitioner are probative of abandonment); see also Cadet II, 853 F.3d at 1234 (severing communication is probative of abandonment).

Mr. Brown's predicament improved with Mr. Bonaccorsy's appointment on February 16, 2000. Nevertheless, his representation of Mr. Brown was also marked by misconduct from the beginning. His first letter to Mr. Brown was sent forty-eight days after he was appointed and a mere thirty days from the § 2254 deadline. In his first letter, Mr. Bonaccorsy all but told Mr. Brown he could not file a § 2254 petition. Mr. Brown asked about his remaining appeals. Mr. Bonaccorsy responded to "clarify what appeals [he] had left" and never mentioned his right to file a federal habeas petition. Of course, Mr. Bonaccorsy got this wrong, which cost Mr. Brown dearly: the deadline for Mr. Brown to file his federal habeas petition passed with no petition filed.

This was all lost on Mr. Brown. Indeed, he seemed to accept that Mr. Bonaccorsy was "qualified to represent [him] on a federal level." In light of Mr.

38

Brown's borderline intelligence and Mr. Bonaccorsy's promise to appeal his "capital collateral claims in the Supreme Court of the United States if necessary," it is not surprising Brown trusted Bonaccorsy's qualifications and representations. However, Mr. Brown was to learn over three years after Mr. Bonaccorsy was appointed that his latest lawyer had "virtually no experience in the federal appellate system." In response, Mr. Brown wrote "at the last minute [Mr. Bonaccorsy] told [him] he wasn't qualified to represent [him] on a federal level." Although Mr. Brown apparently believed he learned about Mr. Bonaccorsy's limitations with time left for a timely filing of his § 2254 petition ("the last minute"), it was in fact three years too late.

The misconduct here is significantly more severe than that confronted by the Cadet II panel. Cadet II involved an attorney's "sincere but persistent misreading of § 2244(d) after his client expressed doubt." 853 F.3d at 1225–26. Here, there does not appear to have been a "persistent misreading" of AEDPA's limitations provisions, because it isn't clear Mr. Bonaccorsy knew it existed. In fact, it is not clear Mr. Bonaccorsy knew Mr. Brown had the right to challenge his conviction and sentence by way of a federal habeas petition until Ms. Bonner told him when he handed Brown's case over to her.[10] At best, this record suggests Mr.

---

[10] The first time the record clearly indicates Mr. Bonaccorsy's knowledge of Mr. Brown's right to file a habeas corpus petition is in his June 26, 2003 motion to withdraw as counsel, where he noted "Ms. Bonner has advised . . . that she will accept representation to pursue MR.

Bonaccorsy failed to perform even the most basic legal research to determine whether Mr. Brown could seek federal habeas relief. At worst, the record suggests Mr. Bonaccorsy, an attorney with "virtually no experience" in federal court, knew there was some possibility Mr. Brown could fight his case in federal court somehow but practically told Mr. Brown the opposite.

Either way, this record does not allow us to conclude Mr. Bonaccorsy's misconduct amounted to no more than gross negligence. As pled, these facts do not suggest Mr. Bonaccorsy merely miscalculated AEDPA's limitations period. They suggest complete ignorance of or even misrepresentations about Mr. Brown's right to federal habeas review. See Holland, 560 U.S. at 652, 130 S. Ct. at 2564 (failing to perform "the research necessary to find out the proper filing date, despite Holland's letters that went so far as to identify the applicable legal rule" was probative of serious attorney misconduct).

Thus, Mr. Brown has pled sufficient facts to demonstrate Mr. Bonaccorsy's representation amounted to serious attorney misconduct. This conclusion is supported by what appear to be extensive periods during which Mr. Bonaccorsy

---

BROWN'S Petition for Writ of Certiorari in the United States Supreme Court and in his federal Habeas Corpus."

The record does suggest, however, that Mr. Bonaccorsy might have known of Mr. Brown's right to file a federal habeas corpus petition earlier. Indeed, in a letter to Mr. Brown dated April 1, 2002, Mr. Bonaccorsy said if they didn't prevail at the Florida Supreme Court, "the next place to appeal would be to the federal courts." If Mr. Bonaccorsy knew then that Mr. Brown could file a federal habeas petition, Bonaccorsy's failure to take steps to preserve that right is all the more inexcusable.

did not communicate with Mr. Brown. The record includes only two letters from Mr. Bonaccorsy responding to Mr. Brown's inquiries about his case over more than three years of representation. See Holland, 560 U.S. at 652–53, 130 S. Ct. at 2564–65. It is also supported by statements suggesting Mr. Bonaccorsy did not "completely consult[]" with Mr. Brown, and that this was Brown's "largest problem."

Then, Mr. Brown's plight worsened dramatically with Ms. Bonner. This record certainly raises the issue of whether Ms. Bonner consistently engaged in serious misconduct, at times amounting to abandonment, dishonesty, bad faith, and divided loyalty or a combination thereof over the nearly six years she represented Mr. Brown.[11]

Again here, the problems with Ms. Bonner's representation began almost as soon as she was appointed. She told the Florida Circuit Court and Mr. Brown (through Mr. Bonaccorsy) she "accept[ed] representation" to, most importantly for our purposes, "pursue . . . his federal Habeas Corpus." In response to Mr.

---

[11] Unfortunately, the failures in Ms. Bonner's representation come as little surprise. This is not the first time our Court has reviewed a case involving serious allegations that her misconduct led to the untimely filing of a § 2254 petition. See, e.g., Thomas v. Att'y Gen, Fla., 795 F.3d 1286 (2015). On remand in Thomas, Florida and William Greg Thomas stipulated that Ms. Bonner filed Mr. Thomas's § 2254 petition nearly a year late "as part of a deliberate strategy to challenge the constitutionality of AEDPA's statute of limitations because she was interested in invalidating AEDPA's statute of limitations herself." Thomas v. Att'y Gen., Fla., No. 3:03-CV-237-J-32PDB, 2018 WL 733631 at *11 (M.D. Fla. Feb. 6, 2018) (emphasis added and alteration adopted). Ms. Bonner represented Mr. Thomas and implemented this dishonest and disloyal strategy, which "result[ed] in [] abandonment," from April 2, 2003 through March 22, 2004. See id. at *11–12, 16–18. This was nearly the same time she began to represent Mr. Brown.

41

Brown's request to have her removed as counsel, Ms. Bonner asked for a status hearing. There, she told Mr. Brown and the Circuit Court it was her intention "to make him comfortable in this most important litigation of his life" that has "been moved into federal court." She also suggested she was an expert in federal habeas corpus litigation, expressly mentioning "incredibly complex" "time bar issues" and saying the "registry recommended [her]" to Mr. Bonaccorsy because of her expertise on these very issues.[12]

In fact, Ms. Bonner had filed nothing in federal court, so Mr. Brown's case hadn't actually been "moved into" federal court as she represented. Worse yet, she did not file any papers in federal court during the nearly six years she represented Mr. Brown, despite his express requests. Ms. Bonner's apparent strategy in responding to Mr. Brown's requests was to ignore them for an extended period of time and ultimately try to persuade him it would be wiser to continue litigating his case in state court. All the while, she downplayed the serious cost of continuing to delay filing a § 2254 petition.

This approach could have reflected a considered strategic choice she promoted to Mr. Brown. However, Ms. Bonner's conduct in other reported cases,

---

[12] The U.S. Supreme Court appointed Ms. Bonner to argue <u>Lawrence v. Florida</u>, 549 U.S. 327, 328, 127 S. Ct. 1079, 1085 (2007), a seminal statutory and equitable tolling case. This may be probative of her expertise and relevant to assessing the severity of her misconduct in representing Mr. Brown. <u>Lawrence</u> was argued and decided while Ms. Bonner was representing Mr. Brown. <u>Id.</u> Any notion she was only negligent or even grossly negligent in delaying Mr. Brown's filing must contend with the fact that she was knowledgeable enough about tolling law to have been appointed by the Supreme Court to argue <u>Lawrence</u>.

see supra note 16, and the record before us suggest something other than good-faith strategizing was at play here.  Approximately one year after the Florida Circuit Court status-of-counsel hearing, on September 29, 2004, Mr. Brown wrote to Ms. Bonner demanding she "withdrawal [sic] from [his] case" since she had "distance[d] [herself] as much as possible from [him]" and "lied to [him] and distorted the appeals process from the beginning."  Mr. Brown clearly felt betrayed.  Ms. Bonner had actively tried to persuade him that he either could not, or should not, file a § 2254 petition, despite having earlier suggested to him that she had already begun litigating his case in federal court.  The record even suggests she did not consider timeliness issues until nearly ten months after her appointment, despite touting her own expertise on these issues at the status-of-counsel hearing.[13]  This record contains an e-mail from Ms. Bonner's investigator to her on May 1, 2004 that began "I agree that his 365 probably ran before the 3.850 was filed but convincing him [Mr. Brown] of this will be tough."

After Mr. Brown wrote Ms. Bonner five times, Ms. Bonner finally responded to him on February 24, 2005.  And this response came only after Mr. Brown wrote Roger Maas from the Florida Commission on Capital Cases

---

[13] The record also indicates Ms. Bonner had not read either of the Florida Supreme Court's opinions in Mr. Brown's case.  Indeed, as the investigator wrote to her, "I would suggest you pull the opinion [describing Mr. Brown's testimony at trial] and review it before you speak to Brown."  Had she read either Brown I or Brown II, she would have already known Mr. Brown testified at trial.  Brown II, 846 So. 2d at 1119; Brown I, 721 So. 2d at 276.

recounting that Ms. Bonner was "unable to repercent [sic] [him] fully," causing

Mr. Maas to reach out to her.  In her response to Mr. Brown, Ms. Bonner

apologized "for the lack of letters," excusing herself by noting "when nothing new

is going on, there is little to say."  She acknowledged Mr. Brown's "preference has

always been to go and litigate in the federal court."  But again, she tried to

persuade Mr. Brown to stay in state court.  She suggested litigating the Keenum

issue in state court might lead to his exoneration, saying "the downside [was] a

time factor only."

Ms. Bonner thus paired a sizeable understatement of the significance of

AEDPA's time bar with a sizeable overstatement of the potential promise of their

state court litigation.  All this may have been part of an effort to convince Mr.

Brown that filing a § 2254 petition was not worthwhile.  And if so, Ms. Bonner did

this while knowing he had "always" wanted to pursue his case in federal court.

Worse, if Mr. Brown doubted Ms. Bonner's loyalty and wanted to try to pursue

federal habeas relief on his own, he faced yet another roadblock.  There is no

indication Ms. Bonner gave Mr. Brown crucial case documents, despite his

December 3, 2003 request for "copi[es] of things [Ms. Bonner] had concerning his

case," which noted he didn't have "much of anything."

This record does not reveal why Ms. Bonner did what she did.  But,

whatever her reasons, her actions do not support the District Court's finding that

44

Ms. Bonner's actions "fail[ed] to demonstrate anything more than simple negligence." The record strongly suggests more. Refusal to file a § 2254 petition despite Mr. Brown's expressed wishes, refusal to provide access to case documents, and long periods of non-communication support a finding of abandonment. See Holland, 560 U.S. at 651–52, 130 S. Ct. at 2564; see also Downs, 520 F.3d at 1322–23. Ms. Bonner's early representations that she would be litigating his case in federal court support Mr. Brown's argument as to her dishonesty and/or bad faith, especially in light of her purported expertise in federal habeas litigation. See Cadet II, 853 F.3d at 1236. Her insistence that Mr. Brown continue litigating in state court, as opposed to federal court, and her minimization of the "time" problem raise issues of loyalty, honesty, and good faith. See id.; see also Thomas, 795 F.3d at 1294–95.

Mr. Anderson replaced Ms. Bonner on April 20, 2009, and Mr. Brown's difficulties continued. Mr. Anderson did finally file Mr. Brown's § 2254 petition. But, for reasons not clear from the record before us, he waited nearly three years after he was appointed to file it. And this delay was despite Mr. Brown's repeated requests and significant efforts. In a pattern that had no doubt become familiar to Mr. Brown by then, Mr. Anderson either did not respond to Mr. Brown's letters or was very late in doing so. These facts, among others, raise the issue of Mr. Anderson's serious misconduct.

45

According to the record we have, Mr. Brown sent Mr. Anderson six letters from October 6, 2010 (after the Florida Supreme Court denied rehearing in Brown III, 41 So. 3d 116) to November 6, 2011.  Some time around early February 2011, Mr. Brown even contacted a woman in England, Ms. Price, asking her to call Mr. Anderson and express his "concern[]" about federal court "filing date[s]" and "deadlines."  There is also evidence he persuaded others to call Mr. Anderson on his behalf.  Nevertheless, Mr. Anderson responded to him just once, by letter dated November 3, 2010.  This letter appeared to respond to Mr. Brown's October 6, 2010 letter and perhaps another letter that is not in the record before us.

Mr. Brown's communications reflect his understandable concern he would be executed without ever having his day in federal court.  And Mr. Anderson's consistent failure to respond portrays an attorney-client relationship driven not by consultation with Mr. Brown or consideration of his interests, but by Anderson's decisions made without regard for what Brown wanted.

Mr. Brown's second letter to Mr. Anderson—the first appearing in this record—conveys confusion, shared by him and his fellow prisoners, about why Justice Quince described his case as "ripe for a warrant" in Brown III.  Mr. Anderson waited nearly a month to respond, suggesting a lack of regard for Mr. Brown's distress.  Mr. Anderson wrote he was "still fighting for [Mr. Brown]" by

46

filing a petition for certiorari with the U.S. Supreme Court. He also noted the Keenum issue was what "we're still fighting for."

Mr. Anderson's choice of words suggests he actually consulted Mr. Brown about how to proceed with the case after Brown III. But the record suggests otherwise. On January 25, 2011, while the certiorari petition was pending, Mr. Brown wrote Mr. Anderson instructing him to file a federal habeas petition or withdraw, so he could find a lawyer who would. Sensing Mr. Anderson did not appreciate the gravity of the situation, Mr. Brown implored him that "bypass[ing]" federal court would be a serious mistake "when a mans [sic] life is at stake."

Mr. Brown's entreaty did not appear to move Mr. Anderson to action. Neither did the phone call from Ms. Price of England, expressing Mr. Brown's concerns about filing deadlines in federal court. Nor did Mr. Brown's March 3, 2011 letter, or the one he wrote the week before, "regard[ing] [his] appeal in the Federal District Court in Jacksonville and the 11th Circuit in Atl [Atlanta]," asking for "some info . . . so [he] can better deal with the situation." And the same for Mr. Brown's November 7, 2011 letter requesting "information on where [his] case stands on appeal." This letter said Mr. Brown "need[ed] this information greatly to proceed with [his] appeal in federal courts" and noted he hadn't heard from Mr. Anderson for over a year, even though he "had several people contact [his] office."

47

Despite Mr. Brown's active urging, Mr. Anderson waited another three months before filing Mr. Brown's § 2254 petition on February 8, 2012.  This was nearly two years after the Florida Supreme Court decided Brown III and just under a year after the Supreme Court denied certiorari.  Brown v. Florida, 562 U.S. 1225, 131 S. Ct. 1476; Brown III, 41 So. 3d 116.  Nevertheless, the petition prepared by Mr. Anderson said it was timely and averred "[t]he time-limit provisions of the AEDPA have been explained to and understood by Petitioner."  This despite a lack of any indication (1) that he explained much of anything to Mr. Brown, let alone § 2244(d), or (2) that Mr. Brown understood § 2244(d).  Mr. Anderson's averment thus raises issues of candor and/or understanding.

It is true Mr. Anderson may have believed, incorrectly but in good faith, that Mr. Brown's certiorari petition tolled the limitations period.  If Mr. Anderson's purported misconduct was limited to such a mistake, Mr. Brown would not be entitled to equitable tolling.  See Lawrence v. Fla., 549 U.S. at 336–37, 127 S. Ct. at 1085; see also Cadet II, 853 F.3d at 1225–26, 1236.  However Mr. Brown has proffered facts suggesting much more.  Thus, even if Mr. Anderson did harbor a mistaken belief in good faith, this would not defeat Mr. Brown's claim.  See Downs, 520 F.3d at 1323.  Much like the lawyer in Holland but not like the lawyer in Cadet II, Mr. Anderson failed to respond to Mr. Brown's concerns and questions.  Compare Holland, 560 U.S. at 652, 130 S. Ct. at 2564, with Cadet II,

48

853 F.3d at 1234–35.  He wrote one letter, but otherwise severed communication with Mr. Brown for months if not more than a year.  And this was a year in which Mr. Brown could have arguably filed a timely § 2254 petition.  In our view, Mr. Brown has sufficiently alleged abandonment, or, at the very least, serious misconduct.  The District Court's contrary finding was error.

Mr. Brown has therefore alleged serious attorney misconduct spanning from the conclusion of the direct review of his case until the filing of his § 2254 petition. There is every indication that each of Mr. Brown's five post-conviction attorneys engaged in serious misconduct, subjecting him to a course of egregious misconduct that prevented him from timely filing a § 2254 petition.  See Holland, 560 U.S. at 652, 130 S. Ct. at 2564; see also Downs, 520 F.3d at 1323.  Because this record also sufficiently shows that Mr. Brown was diligent, we remand to the District Court for an evidentiary hearing on attorney misconduct.

b.    *Due Diligence*

Finally, we turn to the question of whether Mr. Brown was duly diligent in exercising his rights.  The District Court found he was not.  Our review of the record leaves us "with the definite and firm conviction" that the District Court was mistaken.  Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985).

49

In making its finding that Mr. Brown was not duly diligent, the District Court never referenced the thirteen letters Mr. Brown wrote to his attorneys and to the Florida Commission on Capital Cases, some demanding a federal habeas petition be filed. Neither did the District Court address the phone calls Mr. Brown made to Collateral Counsel and Mr. Bonaccorsy or any of the calls he asked others to make on his behalf to Mr. Anderson. The District Court did not consider the discussions he had with Ms. Bonner in which he made his "preference . . . to go and litigate in the federal court" abundantly clear. The court did not expressly consider Mr. Brown's custody at all, much less the fact that he was in Texas or how the resulting "limited access to the courts and his registry counsel" may have impacted his ability to work on his own behalf. See Downs, 520 F.3d at 1323 (noting the due diligence analysis "must take into account the conditions of confinement and the reality of the prison system" (quotation marks omitted)). Relatedly, the court did not clearly address how, and whether, Mr. Brown's attorneys' failure to counsel him about federal habeas rights and procedure affected his ability to exercise his rights. And importantly, the District Court didn't once discuss Mr. Brown's borderline intellectual functioning or his fourth-percentile verbal IQ. It is nearly impossible to believe that this did not impair his ability to assert his own rights. See Hunter, 587 F.3d at 1308.

50

The District Court ruled Mr. Brown was not duly diligent because, after Mr. Bonaccorsy withdrew on July 18, 2003, he "took no action to initiate these proceedings until January 18, 2012"; "waited almost three years to file" after Ms. Bonner withdrew; and "did nothing from the time the Supreme Court . . . denied certiorari on February 22, 2011, until he filed his federal habeas petition more than eleven months later." These findings are flatly contradicted by even the limited record before us. Indeed, after Mr. Bonaccorsy withdrew, Mr. Brown instructed Ms. Bonner and her investigator, we gather more than once, to file a federal habeas petition. He sent Ms. Bonner five letters and even sent one to the Florida Commission on Capital Cases. In one instance Mr. Brown demanded Ms. Bonner withdraw because she "lied to [him] and distorted the appeal process from the beginning." In another, he asked for a new lawyer to be appointed because "she was unable to repercent [sic] [him] fully."

After Ms. Bonner withdrew, Mr. Brown did not just sit and wait. He sent three letters to Mr. Anderson and contacted others to demand Mr. Anderson file a federal habeas petition and caution him against missing deadlines. Then, between February 22, 2011 and November 7, 2011, Mr. Brown instead wrote Mr. Anderson three more times and had "several people contact [his] office" asking for updates on his case "to proceed with [his] appeal in federal courts."

51

If the District Court had fully considered the record, we are confident it would have come to the same view we do here: Mr. Brown exercised reasonable diligence.  See Holland, 560 U.S. at 653, 130 S. Ct. at 2565.  Like the petitioner in Holland, Mr. Brown wrote "numerous letters seeking crucial information and providing direction," and he routinely sought to have lawyers removed when they were not pursuing the legal remedies he sought.  See id.  And he did this despite his borderline intellectual functioning.  Although Mr. Brown never "prepared his own habeas petition pro se," see id., it is far from clear that he could have, given his intellectual limitations, see Hunter, 587 F.3d at 1308.  Further, unlike in Holland, it is far from certain Mr. Brown knew the AEDPA clock had expired or even existed, at least until sometime in 2011.  This, in our view, was a product of Mr. Brown's borderline intellectual functioning, his distant custody during the vast majority of the initial limitations period, and years of serious attorney misconduct. This began with Mr. Bonaccorsy implying, before May 3, 2000, that federal habeas corpus was not something Mr. Brown could pursue.  The delay was not, therefore, a result of Mr. Brown's failure to exercise due diligence.

Our conclusion is supported by Mr. Brown's actions when we understand he first learned about the AEDPA limitations period in early 2011.  This record contains four letters from Mr. Brown urging Mr. Anderson to file his § 2254 petition.  And Mr. Brown successfully solicited several people to call Mr.

Anderson, at least one of whom expressed his concern about AEDPA's deadline. Cf. Hutchinson v. Florida, 677 F.3d 1097, 1103 (11th Cir. 2012) ("Hutchinson's failure to do anything to get his federal habeas petition filed for nearly four years after he learned that the AEDPA clock had run out due to his attorneys' miscalculation is not even 'reasonable diligence.'").  Given these efforts and Mr. Brown's diligence in advocating for himself in the years before 2011, all indications are that Mr. Brown would have been even more persistent earlier had he understood what was at stake.

Therefore, after undertaking the fact-intensive and individualized consideration this inquiry requires, see Downs, 520 F.3d at 1323, we conclude that Mr. Brown exercised due diligence in pursuing his rights.  As a result, the District Court need not consider this issue on remand.

## IV.   CONCLUSION

Mr. Brown has pled enough facts to show that he is entitled to an evidentiary hearing on both statutory and equitable tolling.  We have concluded Mr. Brown was duly diligent based on the already existing record.  This case is accordingly **REVERSED and REMANDED**, and Mr. Brown's Motion to Relinquish Jurisdiction is **DENIED AS MOOT**.[14]

---

[14] Mr. Brown's additional claims for equitable tolling are meritless.  As to Mr. Brown's request to amend his petition on remand, we note "[d]istrict courts have limited discretion in denying leave to amend, and should grant a motion to amend unless there are substantial reasons to deny it." Bowers v. U.S. Parole Com'n, Warden, 760 F.3d 1177, 1185 (11th Cir. 2014).